UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 17-234 (WMW)

UNITED STATES OF AMERICA,

Plaintiff,

v.

GOVERNMENT'S POSITION ON
SENTENCING

BRANDON MARK BJERKNES,

Defendant.

## I.   INTRODUCTION

During his tenure as Assistant Principal of Bemidji Middle School, Brandon Mark Bjerknes created an elaborate social media scheme to sexually exploit minors, including middle-school-aged students.  Bjerknes victimized at least 55 girls and boys, many of whom he personally knew due to his role as Assistant Principal and his previous teaching positions in Bemidji, Minnesota.  Bjerknes' scheme lasted nearly three years before a vigilant parent discovered disturbing social media messages sent by Bjerknes to the parent's 13-year-old daughter.  After a diligent investigation by the Beltrami County Sheriff's Office and the Minnesota Bureau of Criminal Apprehension, law enforcement put an end to Bjerknes' predatory crimes.

The United States, by its attorneys, Gregory G. Brooker, Acting United States Attorney for the District of Minnesota, and Angela M. Munoz-Kaphing, Assistant United States Attorney, hereby files this Position on Sentencing in support of its request that the Court sentence Defendant Brandon Mark Bjerknes to a term of imprisonment of 360 months, followed by a lifetime term of supervised release.  Such a sentence is sufficient,

but not greater than necessary to comply with the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation.

## II.   PROCEDURAL BACKGROUND

On May 30, 2017, Brandon Mark Bjerknes was charged by federal complaint with two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a); one count of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). (Dkt. No. 1).  Bjerknes was preliminarily detained in federal custody until a space was available in a halfway house.  He was released to a halfway house on June 22, 2017, where he remained on 24-hour lockdown.

On September 13, 2017, a two-count Information was filed charging Bjerknes with one count of production of child pornography, in violation of 18 U.S.C. § 2251(a); and one count of attempted coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). (Dkt. No. 20).  Bjerknes entered a guilty plea to both counts on September 28, 2017, and was taken into federal custody following the change of plea hearing.  (Dkt. Nos. 24, 26). Bjerknes is scheduled to appear before the Court on February 6, 2018 for his sentencing hearing.

## III.   ARGUMENT AND CITATION OF AUTHORITIES

In 1984, Congress created the United States Sentencing Commission.  *Mistretta v. United States*, 488 U.S. 361, 362, 366-367 (1989).  The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., directed that Commission to promulgate uniform guidelines that would be binding on federal courts at sentencing.  *Id.* at 367.  One purpose of the Guidelines

was to address and eliminate sentencing disparities among similarly situated offenders.  *See Koon v. United States*, 518 U.S. 81, 113 (1996); 28 U.S.C. § 991 (b)(1)(B).  Congressional statutes instruct the Commission to carry out the objectives of 18 U.S.C. § 3553(a).  *Rita v. United States*, 551 U.S. 338, 348 (2007).  Significantly, as the United States Supreme Court observed in *Rita*:

> The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill this statutory mandate.  They also reflect that the fact that different judges (and others) can differ as to how best to reconcile the disparate ends of punishment. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.

551 U.S. at 349, 350.  Consequently, although the Guidelines are no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245-258 (2005), "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" at sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "The post-*Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review."  *Peugh v. United States*, __U.S.__, 133 S.Ct. 2072, 2083 (2013).

In *Gall*, the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  *Id*. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a

defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

### A.   The Guidelines Range.

The Government agrees that the Probation Officer correctly calculated the Guidelines range in the Presentence Report ("PSR"), which issued December 19, 2017. Specifically, the PSR calculates an adjusted base offense level of 47.  PSR ¶ 94.  Pursuant to U.S.S.G. Chapter 5, Part A, Application Note 2, an offense level of more than 43 is treated as an offense level of 43.  *Id.*  The Defendant's criminal history is category I, which results in an advisory Guidelines range of life imprisonment.  PSR ¶ 132.

The PSR's Guidelines calculation assumed that the Government would recommend a third point for acceptance of responsibility.  PSR ¶ 93.  The Defendant, however, has failed to provide the Probation Officer with financial information and has not signed the "Declaration of Defendant Net Worth and Cash Flow Statements" form in which he would be required to declare under penalty of perjury that the completed financial disclosure forms are true and correct.  PSR ¶¶ 126-129.  The Defendant claims that he is "unaware of his specific financial information" and claims that his wife would be able to provide financial information.  PSR ¶ 126.  It is the Defendant's responsibility to ensure that the Probation Officer receives basic financial information, including information relating to the Defendant's bank accounts, income, and other financial assets.  Paragraph 7.c. of the Plea Agreement requires the Defendant to "provide[] full, complete, and truthful disclosures to the United States Probation and Pretrial Services Office, including providing

complete, accurate and truthful financial information."  Based on the Defendant's failure to provide complete, accurate, and truthful financial information to the Probation Officer, the Government will not recommend the third point for acceptance of responsibility.

Given, the Defendant's high offense level, the application of the third point for acceptance of responsibility is largely academic.  Whether or not the Defendant receives the third point will not change his Guideline sentence, which remains at life imprisonment.

> **B.     An Examination Of The 3553(a) Factors Demonstrates That A Sentence Of 360 Months' Imprisonment Is Appropriate.**

The District Court may not assume that the Guidelines range is reasonable, but instead must make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 50.  Section 3553(a) requires the Court to analyze a number of factors, including the history and characteristics of the Defendant, the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the need for deterrence, and the need to protect the public from further crimes of the Defendant.  18 U.S.C. § 3553(a).  An analysis of these factors shows that a sentence of 360 months' imprisonment is appropriate.

> **1.  The nature and circumstances of Bjerknes' offenses warrant a sentence of 360 months' imprisonment.**

Bjerknes committed a serious crime that is deserving of appropriately serious punishment.  From at least as early as 2014, and continuing through on or about March 20, 2017, Bjerknes engaged in a scheme using various social media applications, including Facebook and Snapchat, to solicit images and videos constituting child pornography from minor females, to engage in sexually explicit conversations with minor females, and to

distribute sexually explicit images and videos to minor females and males.  PSR ¶ 6; Plea Agreement ¶ 2.a.

### a. Bjerknes used his "Brett Larson" social media accounts to target his own students and other minors in the Bemidji area.

While serving as the Assistant Principal at Bemidji Middle School in Bemidji, Minnesota, Bjerknes posed as a 13-15 year old male named "Brett Larson."  PSR ¶ 7; Plea Agreement ¶ 2.a.  Bjerknes created a "Brett Larson" Facebook profile and two Snapchat accounts under the names "brettlarson69" and "Brettlarson6969."  PSR ¶ 7; Plea Agreement ¶ 2.a.  Bjerknes utilized various decoy photographs of a juvenile boy that he found on the internet as his "Brett Larson" profile pictures.  He created an elaborate story about Brett Larson's life, including that he lived in Duluth, Minnesota with his dad, that his mom committed suicide, and that he attended Morgan Park School.  PSR ¶ 7; Plea Agreement ¶ 2.a.

Bjerknes used his "Brett Larson" social media accounts to contact at least 55 minor females and males living in Bemidji, Minnesota and the surrounding areas.  PSR ¶¶ 12, 14-26; Plea Agreement ¶ 2.b.  Bjerknes personally knew many of the minors that he contacted because they were students at Bemidji Middle School when he contacted them, or because he had come in contact with the minors or their families when he served in previous teaching and leadership positions with Bemidji Area Schools.  PSR ¶¶ 12, 14-26; Plea Agreement ¶ 2.b.

### b. Bjerknes initiated and pursued graphic, sexual conversations with his much younger minor victims.

Bjerknes used his "Brett Larson" accounts to target minor females as young as 12 years old. He had knowledge of the minor females' ages because he personally knew his victims and/or because the victims told him their true and correct age during their social media chats. After contacting his victims via social media, Bjerknes would begin grooming the young girls. He first engaged in "small talk" where he would learn the victim's age and where they lived. In turn, he shared biographical information about "Brett Larson." Next, Bjerknes directed the conversation towards a sexual topic, and aggressively pursue highly sexualized and graphic conversations. Bjerknes graphically described sexual acts that he wanted to perform with the minor females and described how he was sexually aroused by the minors themselves.

For example, Bjerknes instigated a game of truth or dare with Minor #1, at the beginning of the school year, in September 2016. PSR ¶ 15; Plea Agreement ¶ 2.h. At this time, Minor #1 was 13 years old and Bjerknes was thirty-four years old. Bjerknes personally knew Minor #1 because he participated in meetings pertaining to Minor #1 at Bemidji Middle School in his role as Assistant Principal. Bjerknes "dared" Minor #1 to watch a pornographic video clip that he sent to her via Snapchat. Bjerknes also "dared" her to send photographs, which were sexual in nature, of her various body parts. Bjerknes' directions to Minor #1 included:

| | |
|---|---|
| **Author** | Brett Larson (100006222645965) |
| **Sent** | 2016-09-03 22:03:24 UTC |
| **IP** | 96.2.168.87 |
| **Deleted** | false |
| **Body** | same kinda panty pic... but pull them down some and show some yummy hair |

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:30:30 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** u should spread ur legs some

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:30:54 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** wana see more porn?

When Minor #1 became hesitant about what Bjerknes directed her to do, he would send her photographs of his own underwear and genitalia to encourage her to continue responding to his "dares." Bjerknes also complemented Minor #1's appearance to ensure her continued participation.

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:05:01 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** thats reallyl really hot

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:05:05 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** but can i see a little more

**Author** MINOR #1
  **Sent** 2016-09-03 22:05:32 UTC
**Deleted** false
  **Body** No!

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:05:37 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** ohhhhh baby

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:05:39 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** please

**Author** Brett Larson (100006222645965)
  **Sent** 2016-09-03 22:05:43 UTC
    **IP** 96.2.168.87
**Deleted** false
  **Body** wanna see some of mine?

8

Unfortunately, Minor #1 was only one of many young girls that Bjerknes preyed on during this time frame.  Between approximately July 2016 and November 2016, Bjerknes, posing as "Brett Larson" engaged in numerous, lengthy graphic conversations with Minor #5, a 12-year old girl, on Facebook and Snapchat.  At this time, Bjerknes was thirty-four years old.

Bjerknes' conversations with Minor #5 initially started on Facebook.  As he directed the conversation to a sexually explicit topic, he suggested that they switch over to Snapchat:



```
Author  Brett Larson (100006222645965)
  Sent  2016-08-11 19:14:49 UTC
    IP  96.2.168.87
Deleted  false
  Body  would u let me finger u?

Author  Brett Larson (100006222645965)
  Sent  2016-08-11 19:15:01 UTC
    IP  96.2.168.87
Deleted  false
  Body  we should talk like this on   here

Author  Brett Larson (100006222645965)
  Sent  2016-08-11 19:15:03 UTC
    IP  96.2.168.87
Deleted  false
  Body  snap?
```

Bjerknes continued pursuing social media-based conversations with Minor #5 on Facebook and Snapchat.  Bjerknes' Facebook messages frequently referred to previous conversations when he received photographs from Minor #5:

**Author** Brett Larson (100006222645965)
   **Sent** 2016-10-09 18:52:17 UTC
     **IP** 96.2.168.87
**Deleted** false
   **Body** ur boobs were absolutely perfect btw

**Author** Brett Larson (100006222645965)
   **Sent** 2016-10-09 18:52:28 UTC
     **IP** 96.2.168.87
**Deleted** false
   **Body** do you even realize how hot u actually are???

**Author** | Minor #5
   **Sent** 2016-10-09 18:52:57 UTC
**Deleted** false
   **Body** i dont think i am

**Author** Brett Larson (100006222645965)
   **Sent** 2016-10-09 18:53:13 UTC
     **IP** 96.2.168.87
**Deleted** false
   **Body** u are

**Author** Brett Larson (100006222645965)
   **Sent** 2016-10-09 18:53:15 UTC
     **IP** 96.2.168.87
**Deleted** false
   **Body** trust me

Bjerknes' pursuit of photographs from Minor #5 intensified during November 2016. On November 11, 2016, Bjerknes contacted Minor #5 while she was at school:

On November 13, 2016, Bjerknes sent the following messages via Snapchat to

Minor #5:

| Author | Content of Message |
|--------|--------------------|
| Bjerknes | And blast a load of cum into your [sic] oussy |
| Bjerknes | I kiss you u more |
| Bjerknes | And move down and lick my own cum from your pussy |
| Minor #5 | Oh babe |
| Bjerknes | Sound good? |
| Minor #5 | Oh yes |
| Bjerknes | I really wanna cum for u right now |
| Bjerknes | And show u how much I love you |

Later in the conversation, Bjerknes relentlessly pressured Minor #5 to send him photographs of herself:

| Author | Content of Message |
|--------|--------------------|
| Bjerknes | Can u sneak off so no one sees? |
| Minor #5 | No in the middle of a game |
| Bjerknes | Fuck |
| Bjerknes | Can u run to the bathroom to "pee" and snap one pic of ur pussy and head back |
| Bjerknes | And then I will have a pussy pic to cum [sic] too? |

When interviewed by law enforcement, Minor #5 reported that in response to Bjerknes' social media messages, she sent photographs of her vagina and breasts to "Brett Larson" via Snapchat.  PSR ¶ 24.

Bjerknes' conversations with Minor #1 and Minor #5 are just two examples of how Bjerknes used social media to relentlessly instigate and pursue highly sexualized conversations with his young victims for his own sexual pleasure.

### c. Bjerknes used his "Brett Larson" social media accounts to produce child pornography.

In addition to the graphic conversations, Bjerknes used the "Brett Larson" decoy social media accounts to direct minor females to send him photographs of their specific body parts, including their genitalia, and photographs or videos of the minor females engaged in specific sexual acts or poses.  Bjerknes directed the minor females to send these images and videos to him via Facebook and Snapchat.  Due to Bjerknes' pressure, persistence, and coercion, six known minor females (referred to as Minors #1 through #6) sent him sexually explicit photographs and/or videos of themselves.

With respect to Minor #1, Minor #2, and Minor #3, Bjerknes used his two iPhones, one he referred to as his "personal" iPhone and one issued by his employer that he referred

to as his "work" iPhone, to create videos of himself viewing sexually explicit photographs and videos sent to him at his request by the minor females via the Snapchat application. Due to the functionality of the Snapchat application, messages or "snaps" automatically disappear after they are viewed.  In order to create a permanent record and preserve the sexually explicit materials, Bjerknes opened and viewed the sexually explicit material on one iPhone, and used his second iPhone to record himself viewing the original messages or "snaps" from Minor #1, Minor #2, and Minor #3.  When Bjerknes created a permanent record of the photographs and videos he coerced and enticed the young girls to send, he also captured his own messages directing the actions of his minor victims.

Bjerknes' predatory actions leading to the production of child pornography depicting Minor #2 are exemplary of his production of child pornography depicting Minor #1 and Minor #3.  Bjerknes first contacted Minor #2 on Facebook in November 2016. Through their initial conversations, Bjerknes learned that Minor #2 was 12 years old and Bjerknes suggested they continue talking on Snapchat.  At some point in time, Bjerknes moved the conversation over to Snapchat, and began asking Minor #2 for sexually explicit photographs.  Minor #2 reported that she sent Bjerknes naked photographs per his requests. In March 2017, Bjerknes began using his two iPhones to create a permanent recording of his directions to Minor #2 and the child pornography depicting Minor #2.  Bjerknes directed Minor #2 to send him images of her vagina and of her engaging in masturbation. After receiving two images of Minor #2's vagina, Bjerknes gave her specific instructions as to what to send him next: "show it [Minor #2's vagina] without it spread open."  Bjerknes complemented her appearance – "U have a wicked awesome body" – and then continued

to dictate what he wanted to see – "I wanna see it all wet and yummy."  In total, Bjerknes created 10 videos of himself opening and viewing sexually explicit photographs of Minor #2.

The videos Bjerknes created of himself opening and viewing his Snapchat conversations with Minor #1 and Minor #3 capture similar commands that he directed at those victims: "Ur pussy and my dick love each other[.] Take one with ur hand out of there"; "Omg[.] I love u[.] Spread ur legs"; "That is the most beautiful thing I have ever seen[.] I am gonna cum so much[.] Can I see ur tits[.] Can u take a vid playing with ur pussy? Should I blow my cum soon?"  This disturbing language intentionally directed at multiple minor victims is a measure of Bjerknes' depravity.

### d. Bjerknes distributed and traded sexually explicit images of himself, of other adults, and of his minor victims.

In addition to the graphic conversations and persistent requests for sexually explicit photographs of his victims, Bjerknes frequently distributed sexually explicit materials to minors.  On approximately 20 occasions, Bjerknes sent photographs of his own genitalia to his much younger victims.  As described above, sometimes he sent the photographs as part of his grooming of the victims.  Minor #3 reported to law enforcement that Bjerknes wrote her name with his semen and sent her a photograph of it.  Minor #3 was 13 years old when she received that photograph.

Bjerknes distributed materials containing adult pornography to multiple victims.  He also distributed child pornography.  When conversing with Minor #7, a 15-year-old male, Bjerknes distributed multiple sexually explicit images depicting Minor #4 that he received from her several months before chatting with Minor #7.  Bjerknes' goal was simple.  He

14

wanted to distribute images he obtained of Minor #4 to Minor #7 in order to receive additional sexually explicit images of other minors that he believed were in Minor #7's possession.   All of Bjerknes' distribution activities were intended to groom his much younger victims so that they would continue to send him sexually explicit images of themselves, or provide him with other sexually explicit materials in their possession.

The depravity of Bjerknes' crimes warrant a sentence of 360 months' imprisonment. Such a sentence is necessary to reflect the seriousness of his offenses and to provide just punishment for his victimization of numerous minor victims.

## 2. Bjerknes' History and Characteristics warrant a sentence of 360 months' imprisonment.

Unlike many Defendants that come before this Court, Bjerknes had every advantage available to him.   He grew up in a middle-class household with two parents and an older sister.   Bjerknes describes his upbringing as "wonderful" and void of any forms of abuse from his parents or elsewhere.   Bjerknes obtained a Bachelor of Science degree, cum laude, from Bemidji State University in 2005, and a Master of Science degree in education from Bemidji State University in 2007.   Bjerknes married his current wife in 2009 and the couple subsequently had two children in 2013 and 2015.   Bjerknes was employed with the Bemidji Area School District from September 29, 2005 until he resigned on April 17, 2017, and held various teaching and leadership positions.   Bjerknes also owned and operated a graphic design and screen printing business.

By any standard, Bjerknes had everything going for him.   He was financially stable. He had a loving family.   He had a promising career.   But, in March 2017, due to a vigilant

parent and dedicated law enforcement personnel, it was brought to light that Bjerknes was and is a sexual predator.

The sheer number of victims, in combination with the manner in which Bjerknes solicited and produced child pornography, and the voluminous and prolific sexual conversations establish that Bjerknes is a dangerous person. There is no denying that Bjerknes is sexually attracted to middle-school-aged girls. Bjerknes' social media scheme lasted nearly three years. The forensic evidence shows that Bjerknes was logged into the "Brett Larson" accounts during all hours of the day and for lengthy periods of time. Bjerknes's unwillingness or inability to control himself makes him a dangerous person.

What makes Bjerknes particularly depraved is that he used his role as Assistant Principal at the Bemidji Middle School to fuel his predatory behavior. An Assistant Principal is a leadership role and a person in that position is privy to a host of private, confidential student information. Parents, students, and other school employees placed their trust in Bjerknes. He used information that he obtained as Assistant Principal to identify the most vulnerable of the students at his own middle school at times in their lives when they were at their most vulnerable stage. He knew which students had behavior, cognitive, and/or social issues, and he used that information to his advantage.

Bjerknes also used his knowledge and experience with middle school students to target and prey on other vulnerable middle-school-aged victims that he located via social media. Bjerknes persuaded his victims to share their most private information. For example, multiple victims told him they practice self-harm, cutting behaviors; two victims reported they were transgender and in the process of transitioning genders; and other

victims shared information about stressful situations at home. Then, Bjerknes leveraged the information he learned from and about the victims to sexually exploit them for his own pleasure.

Unlike many Defendants who come before this Court, there are no mitigating factors when considering Bjerknes' history and characteristics. Bjerknes was trained and educated to teach and protect children. Rather than using his knowledge as he was expected and trusted to do, he exploited his position and the children he was entrusted to teach and protect. A 360 month sentence is appropriate given the nature of Bjerknes' history and characteristics.

### 3. The need to protect the public from Bjerknes' future crimes warrants a sentence of 360 months' imprisonment.

In sentencing Bjerknes, the Court must weigh the need to protect the public from his future crimes. *See* 18 U.S.C. § 3553(a)(2)(C). "The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure." *Irey*, 612 F.3d at 1238. In considering his likelihood of recidivism, "a court may take into account any evidence of obvious incorrigibility and conclude that leniency has not been effective." *United States v. Gant*, 663 F.3d 1023, 1030 (8th Cir. 2011) (quoting *United States v. Walking Eagle*, 553 F.3d 654, 657 (8th Cir. 2009)).

Bjerknes is a danger to recidivate. The evidence shows that Bjerknes is practiced at deceiving others, including those closest to him. Bjerknes was gainfully employed, married and living with his wife and two small children during the entire period of time when he was preying on his students and other minors in his community and throughout

Minnesota.  When first interviewed by law enforcement in March 2017, Bjerknes admitted that he engaged in the offense conduct when at his family's home while his wife was caring for their children or after she went to sleep at night.  Bjerknes explained that he was bored and curious about the young girls that he contacted on social media.  The forensic evidence in this case shows that Bjerknes used his "Brett Larson" profile to prey on his victims during all hours of the day, including during holidays.  The extensive, detailed conversations prove that he preyed on the victims in this case for his own perverse sexual pleasure.  Bjerknes intentionally targeted middle-school-age girls for nearly three years when he was serving as an Assistant Principal at the very middle school where many of his victims attended school.  Bjerknes knew that his actions were wrong, yet he could not or would not control himself.

There is no evidence that Bjerknes reached out to his wife, family, friends, school colleagues, or a therapist for help in stopping his predatory actions or to report that he was suffering from some kind of mental health issue.  He was stopped only because his actions and words were finally viewed by someone other than Bjerknes and his minor victims.  Consequently, a sentence of imprisonment of 360 months is necessary to protect the public from the Defendant's further crimes.

**4. The need for deterrence warrants a sentence of 360 months' imprisonment.**

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages the Defendant from ever committing similar crimes again.  Despite Bjerknes' education and previous experiences with the criminal justice system, he was not deterred from engaging in a lengthy series of offenses

against his minor victims.  Only a significant sentence is likely to influence the Defendant's future behavior.  Accordingly, a sentence of 360 months' imprisonment is an appropriate attempt to deter the Defendant from committing this crime or a similar crime again in the future.

A significant sentence is also important as a general deterrent.  General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress has specifically made general deterrence an appropriate consideration under 3553(a)(2)(B), [it is] one of the key purposes of sentencing." *Ferguson v. United States*, 623 F.3d 627, 631-32 (8th Cir. 2010).  Moreover, Congress, the United States Supreme Court, and the United States Sentencing Commission have made clear that general deterrence is a very important sentencing goal in child pornography offenses. *See United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010) ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product") (citing *Ferber*, 458 U.S. at 760), *cert. denied*, 563 U.S. 917 (2011).


Unfortunately, the proliferation of personal consumer electronic devices and free social media applications has resulted in a new opportunity for sexual predators to harm and abuse children.  The Court is in a position to send a strong message to those like the Defendant who seek and derive sexual pleasure from the exploitation of children through these easily obtained tools.  A sentence of imprisonment of 360 months is appropriate as both an individual deterrent and a general deterrent.

**C.  A Lifetime Term Of Supervised Release Is Appropriate Under The Circumstances Present Here**

A lengthy term of supervised release is also important to protecting the public from Bjerknes, and to ensure his compliance with the law.  The law requires at least five years of supervised release, and permits the imposition of lifetime supervised release.  *See* 18 U.S.C. § 3583(k).  Given the nature of Bjerknes' offenses, a lifetime of supervised release is warranted.  As noted herein, Bjerknes has demonstrated that he is either unwilling or unable to control his sexual attraction to minors.  He has also demonstrated a significant and ongoing interest in sexual relations with minor females.  As noted herein, the tools used by Bjerknes to commit his crimes are readily available.  Bjerknes' consumer electronic device activities, internet activities, and work activities must be closely monitored after he is released from prison.  Bjerknes must be supervised following his release from prison in order to ensure that he lives a law-abiding life in the future.

**D.  Restitution**

The Government is aware of one victim who has sought restitution in this matter.  If the Defendant has not reached a settlement with this victim or any others that seek restitution, at the time of sentencing, the Government will seek additional time from the Court to resolve the victim's requests.

**IV.  CONCLUSION**

For the reasons set forth above, the Government respectfully asks the Court to sentence the Defendant to a term of 360 months' imprisonment, followed by a lifetime term of supervised release.  The requested sentence is commensurate with the Defendant's

criminal conduct and consistent with the Section 3553(a) factors.  Most importantly, under

all the facts and circumstances of this case, it is also fair and just.

Dated: January 2, 2018

Respectfully Submitted,

GREGORY G. BROOKER
Acting United States Attorney

*/s/ Angela M. Munoz-Kaphing*

BY:  ANGELA M. MUNOZ-KAPHING
Assistant U.S. Attorney